STATE EX REL. OWEN, Attorney General, vs. DONALD, Secretary of State.

*April 15, 1916.*

*Accounting as to trust funds and lands: Referees' report modified and confirmed.*

The following report of the special referee, Judge Samuel D. Hastings, appointed by the court in the above entitled action (see 160 Wis. 21, 156) was filed October 7, 1915, and is here printed by order of the court:

REPORT OF SPECIAL REFEREE.

By the judgment of the court in the above entitled action, it was referred to the undersigned, as special referee, for an accounting. The order is that

"There shall be an accounting . . . of all dealings with the trust fund lands of the date of ch. 367, Laws 1897, and so long prior thereto as practicable, not earlier than the de-

cision under ch. 537, Laws 1865,—and of lands acquired under the forestry legislation since 1897, except those donated to the state for forestry purposes or acquired by proceeds of the latter, and an accounting of all proceeds of such trust lands and income thereof and income which such proceeds would have earned had the same been devoted to the trust to which they belonged, such accounting to include all moneys paid into the forestry fund or general fund, derived from trust fund lands or lands purchased therewith and income from such proceeds, and a partition shall be made of the entire property so found equitably and legally to belong to the constitutional trusts, including any indebtedness from the general fund; giving due credit for all proper disbursements chargeable to such trust funds,—so that each of the constitutional trusts will have its equitable and legal portion of the trust fund property with identity established as to lands and other assets, as near as may be, after the manner of the decision under ch. 537, Laws 1865. Such accounting shall include all matters not specifically mentioned so far as necessary to cover the field discussed in the opinion and carry out the intent thereof, guided by such opinion."

The proceeding in which this order was made is conceded to be without precedent. The action as originally commenced terminated by the decision of the court that the relator had no cause of action. His claim called the court's attention to the fact that the legislature, and public officials pursuant to its direction, had been dealing in an unconstitutional manner with funds appropriated by the constitution to specified purposes, with the result of diverting from said purposes part of said funds. Upon its own motion the court caused to be made matter of record facts showing the general character of such unconstitutional dealing with such funds; by its process restrained the public officials from further dealing with the property of said funds; decided definitely certain questions as to the constitutional power of the legislature to deal with them; and proposes, by its final judgment, to determine the status of all the remaining property which was originally devoted to such purposes, and how much of the

·other property of the state should be taken and devoted to said purposes in place of that wrongfully used.   The order imposes upon the referee the duty of ascertaining, within certain specified limits, the dealings of the legislature and officials with said funds, the duty of deciding questions arising out of facts discovered, not definitely met by the decision because not definitely presented by the facts before the court. It leaves it for the referee to decide how far certain lines of investigation are practicable, and how far "the accounting shall include all matters not specifically mentioned, so far as necessary to carry out the intent of the court, as expressed in their opinion."

The scope of the order makes it proper, if not necessary, to state somewhat in detail my construction of it and some of the questions that the facts have presented and my solution of them.

The order calls for an accounting and partition of property.

The accounting is not between two or more different persons or corporations, each owning separate interests in property to be partitioned, or between parties mutually indebted to each other.

The accounting is between different funds all belonging to the same party—the state.

Technically a fund consists of money or its equivalent, as distinguished from land or other kinds of property from which it is derived.   Art. X of the constitution uses the term in that sense.   But the legislature has used the term as including lands from which the money is derived, and I have used it with that meaning in this report by referring to .certain lands and property rights as belonging to certain funds.

The state keeps account of the moneys coming ·into the hands of its treasurer under the heads of different funds, theoretically treating each fund as if it were a separate purse

or pocket into which all moneys received for the several different uses or purposes were respectively placed.

The funds with which this report deals are designated by the statutes and officials as (1) university fund; (2) agricultural college fund; (3) school fund; (4) normal school fund; (5) drainage fund; (6) forest reserve fund; (7) general fund; and when all the property going into a fund is to be kept intact as a permanent principal, only the income to be spent, the income is treated as a separate fund and a separate account kept of it, as the "university fund" income account; the "school fund" income account.

The constitution creates two funds.    Art. X.    The only one continued by the statute just as created, and named, is the "university fund."    It consists of the proceeds of all lands granted to the state for a university.    The other is the school fund.    The constitutional "school fund" consists of certain specified moneys and the proceeds of all lands granted to the state for educational purposes—except for a university—and all moneys derived from grants not specifying any purpose for which it is made.    The agricultural college grant and the swamp land grants were made after the constitution was adopted, and all moneys derived from them for school purposes are part of the constitutional school fund.    But the legislature has subdivided this fund by calling that part of it derived from the agricultural college grant "agricultural college fund;" and that portion of it derived from the swamp land grant "normal school fund," leaving the remainder to be known as the "school fund."    But these subdivisions retain the characteristics and protection of the constitutional funds.

The drainage fund differs from the educational funds in that it is not a permanent fund with an income which is all that can be spent.    The entire proceeds of the property from which it is derived is to be spent, and it is not a fund created or protected by the constitution.    This distinction is recognized in the court's opinion by referring to the "drainage fund" and the "constitutional trust funds."

The "general fund" is that in which the state keeps all its funds not belonging to one of said constitutional funds or some other fund which the legislature has created in which to keep part of the state's funds which the legislature has appropriated to a particular purpose and over which it has control unrestrained by any constitutional provision or grant creating a trust. Such is the character of the forest reserve fund so far as it consists of funds provided by the state, as distinguished from lands and moneys granted to the state to be used only for forestry purposes and to be returned to the donor or grantor if not so used. And in the accounting between the general fund and the constitutional trust funds, the forestry fund, so far as not a trust fund, is treated as a branch of the general fund, to the extent of treating any indebtedness that may be found due from the forestry fund as part of the indebtedness of the general fund.

The property to be partitioned consists, first, of property owned by the state; second, indebtedness of one fund to another, the claim being assigned to the creditor fund as an item of property belonging to it.

## Property.

I find that all the lands ever conveyed to the state for the support of a university have been scheduled and kept separate in the records of the state land office as university fund lands; that all the lands ever conveyed to the state for the support of an agricultural college have been separately scheduled in the records of the state land office as agricultural college fund lands; and that all the lands conveyed to the state to be used for educational purposes, not included in the two classes last mentioned, have been separately scheduled in the records of the state land office as school fund lands, and that there never has been any action by state officials relative to any of said lands tending to create any confusion or uncertainty as to which of said funds the lands respectively belong. The only actions by the legislature which could tend to cre-

ate any confusion or uncertainty as to the status of said lands . as belonging to the several funds are the statutes of 1903 and 1905, referred to in the decision in this case, purporting to set aside state lands as a forest reserve. Those acts having been adjudged unconstitutional and void, all of said lands remain fully identified by the records as to which fund they belong. And I have not deemed it necessary, in order to comply with the intent of the order of the court, to have separate lists of the unsold lands made and attached to my report for the purpose of establishing their identity as property belonging to the respective funds.

Those conveyed to the state under the provisions of the act of 1850 are designated swamp lands. Those conveyed to the state pursuant to the provisions of the act of 1855 were given to indemnify the state for lands it failed to receive conveyances for covered by the grant of 1850, and the character of its title is determined by the act of 1850. They are designated "indemnity lands." When the state acquired title to any of these lands, swamp or indemnity, the extent to which they became part of the normal school fund or the drainage fund depended upon the action of the legislature under the provisions of the act of 1850 relative to them.

The only confusion or uncertainty as to which fund lands now owned by the state belong is confined to the lands obtained under the swamp land grant of 1850 and the indemnity grant of 1855. That all now owned by the state belong to either the normal school fund or the drainage fund is clear beyond question. The question not definitely decided by the court is whether all, and, if not all, how many, have become normal school fund lands.

I interpret the court's decision as deciding that the act of Congress of 1850, granting the swamp lands to the state, imposed upon it the duty of deciding what share of said lands or the proceeds derived from their sale was necessary for their reclamation or drainage; that all of said lands which

the legislature decided were not necessary for such reclamation or drainage were made by the constitution a part of the school fund; that once having been relieved of all trust for the purpose of reclamation, and by the constitution made school lands, they could not afterwards be relieved or divested of their character as such; and that while the decision of the legislature that certain of said lands are not necessary for reclamation is final as to such lands, it does not prevent the legislature from later deciding that more or other of said lands are not necessary for reclamation.

The question is, What constitutes a decision by the legislature that some of said lands are not necessary for reclamation? It is decided that by the act of 1865 and subsequent acts referred to in the court's decision, the legislature decided that half of all the lands, both swamp and indemnity, were not necessary for reclamation, and such half became normal school lands. Have they since decided that all or part of the remaining half were not necessary?

The federal supreme court, whose decisions are binding on construction of federal statutes, have construed the act of 1850 and held that certain action by the legislature relative to the lands amounts to a decision by it that the lands referred to are not necessary for reclamation. A state legislature had given a portion of the lands to a corporation to be used for other purposes than reclamation. The title of the state's grantee was questioned on the ground that the state could not dispose of the lands in violation of the trust created by the grant. The court held that, when the state had decided that the lands were not necessary for reclamation, it was freed from any trust relative to them and could use or dispose of them for any purpose, and "that any application of the proceeds by the state to any other object is to be taken as a declaration of its judgment that the application of the proceeds to reclamation of the lands is not necessary." See *U. S. v. Louisiana*, 127 U. S. 182, 8 Sup. Ct. 1047.

In *State ex rel. Douglas v. Hastings,* 11 Wis. 448, 453, in referring to the statute which provided that half of the proceeds of sale of swamp lands should be devoted to drainage, the court say: "That act is a legislative declaration or recognition that at least so much" is necessary to be appropriated to the purposes specified in the act of Congress. Giving or devoting to another purpose must be an equally clear declaration that the lands or funds given are not necessary for the purposes specified in the act.

The construction put by the court, in the opinion in this case, on the act of our legislature in 1865 is in harmony with the decision of the federal court. The legislature never made any declaration of its decision that half of the lands were not necessary for reclamation in any other manner than by disposing of them for another purpose. There can be no doubt that their act would have amounted to such a decision had there been no constitutional provision affecting them. It is true that in the case before the federal court there was no constitutional provision which prevented the legislature from disposing of the lands for any purpose it saw fit, after relieving the state from any trust as to them, by its decision that they were not necessary for reclamation, and that the legislature of this state, by the act of 1865, set aside part of the lands for the use for which the constitution held them; so soon as the legislature had made its decision that they were not necessary for drainage. . In both cases there was no constitutional objection to the disposition made of the lands by the legislature, while an act of the Wisconsin legislature attempting to dispose of the lands after the state was relieved from any trust imposed by the grant, for any other purpose than schools, would be unconstitutional and void. But that fact could not render less clear and emphatic the decision of the legislature that the lands were not necessary for the purposes of reclamation. The decision that the lands are not necessary for reclamation must precede the decision

to give, and the decision to give is as conclusive evidence of the prior decision as to the necessity of retaining the lands for the purpose of the trust, when the decision is to give for an unauthorized purpose, as when it is to give for an authorized purpose. The fact that an unconstitutional act is as void and ineffectual as to all unconstitutional provisions as if never enacted, does not affect the question. It is the fact of the second decision, and not its validity or effect, that is conclusive evidence of the decision which necessarily precedes it. It was not the act of the legislature in 1865, devoting one half of the swamp lands to school purposes, and designating them and the proceeds of their sale a normal school fund, that made them part of the constitutional school fund and surrounded them with the constitutional protection against the legislature devoting them to any other purpose. Had there been no constitutional provision putting that class of lands into the constitutional school fund, any subsequent legislature could have taken them out of the normal school fund and devoted them to other uses than schools. It was the constitution that attached the constitutional trust feature to the state's title so soon as the legislature decided that the lands were not necessary for reclamation purposes. That decision was the only act of the legislature that was a factor in converting the lands into constitutional trust fund lands. Should the legislature, in express terms, by recital or section in a statute, state its decision that the lands mentioned in the act were not necessary for reclamation, and then by another provision or section of the act give the lands to some purpose not authorized by the constitution, the fact that the latter provision would be void would not render null and void nor work a reversal of their decision. The question to be decided by the legislature under the act of 1850 is one of fact and not of policy, and it cannot be assumed that the legislature would not have decided the question as they did had they realized that they could not give the lands away after being relieved

from the trust. That would be accusing them of deciding a pure question of fact contrary to what they understood the fact to be.

The act of deciding the question of fact is judicial, not legislative. Had the act of Congress making the grant provided that the decision should be made by the governor or secretary of the interior, the act of the officer named would have been of the same character as that of the legislature,— not the making of a law but the decision of a fact. While the fact that one provision of a statute which is the inducement for another is void because not a lawful exercise of legislative power, renders void and of no force the other provision which in itself is constitutional, the presumption being that the legislature would not have enacted the valid one alone, the fact that the legislature has no power to enact a statute—a legislative act—giving away swamp lands after deciding that they are not necessary for reclamation, cannot have the effect of destroying the fact that they have made the decision, or of changing it.

I have construed the law and the opinion of the court to be that, whenever the legislature has by an enactment in the form of a statute provided that lands which at the time constituted part of the swamp or indemnity lands, which it had not previously decided were not necessary for reclamation, should be devoted to some other use, whether that use was one authorized by the constitution or not, it has by such act made known its decision that such lands were not necessary for the purposes of reclamation, and that such lands were changed by the constitution from drainage fund to school fund lands.

To what fund or funds do the unsold swamp and indemnity lands, to which the state has unquestioned title, belong? I have classified them under three heads: *First,* those described in Schedule A are lands actually partitioned to the normal school fund, pursuant to ch. 537, Laws 1865, and subsequent acts of the legislature. *Second,* those described

in Schedule B are lands actually partitioned to the drainage fund pursuant to ch. 537, Laws 1865. *Third,* those described in Schedule C are lands not actually partitioned between said funds, but under the rule of the decision of 1865 belonging to both in common, each entitled to an undivided half, the fund to be divided when the lands were sold. It is clear that all the lands described in Schedule A and the undivided half of those described in Schedule C belong to the normal school fund. Those described in Schedule B and the undivided half of those described in Schedule C belong to the drainage fund, unless the legislature since 1865 has decided that some or all of them were not necessary for the purposes of reclamation.

Ch. 264, Laws 1905, provides that "The sale of all lands belonging to the state north of town 33 shall cease upon the passage of this act, and such lands north of town 33 shall constitute the state forest reserve." This act was amended by ch. 638, Laws 1911, so as to include all lands within the Menominee, Stockbridge, and Munsee Indian reservations. Permission is given to sell some of the lands upon recommendation of the state forester and approval of the state board of forestry, but the proceeds of such sales are to constitute a forest reserve fund to be used only for forestry purposes.

I construe this act as a declaration by the legislature of its decision that none of the swamp lands falling within the description were necessary for reclamation, and that decision changed such lands from the drainage to the school land class and they became part of the normal school fund, if they had not become such before.

But not all of the lands described in said Schedules B and C are north of town 33 or within said reservations. Those not north of town 33 or within one of said reservations are not affected by said act and remain part of the drainage fund to the same extent as before its passage, unless changed to the school land class by some other act of the legislature.

Ch. 450, Laws 1903, provides that "all public lands remaining unsold, and all lands so withdrawn from sale, and such other lands as the state may hereafter acquire for that purpose shall constitute the state forest reserve." The act provides that if the state forester concludes that it is for the best interest of the state that any particular parcel of said lands be not reserved as part of the state forest it may be sold. But as none might be sold but all be retained as part of the forest, the act necessarily carries with it the declaration that the legislature had decided that none of the lands were necessary for reclamation, and such decision changed the lands which were drainage lands to the school land class.

I therefore find and report that all of the lands described in Schedules A, B, and C are normal school lands and belong to the normal school fund.

There is language in the opinion and judgment of the court which may seem or be inconsistent with my conclusion. Secs. 250 and 251 of the Statutes provide for the same division of swamp and indemnity lands between the normal school and drainage funds as was provided for by the act of 1865. It is made clear that those provisions are still in force so far as they affect the lands set aside as normal school lands. If they are equally in force as to the other half of the lands, it may be the opinion of the court that they are still part of the drainage fund. The judgment only adjudges that the half set aside for educational purposes by the act of 1865 are school lands. The implication may be that the other half are not. The opinion says: "Such sections are a part of the written law of this state, unaffected by any act, or part thereof, *so far as interfering with the proceeds of the* lands partitioned off to the school fund class under the law of 1865 or lands which should be, under the rule there, going as in such act provided." The writer of the opinion wrote the syllabus. It reads in part:

"30. The partition of the swamp lands under ch. 537, Laws 1865, one half for school purposes and one half for

drainage purposes, relieved the former from any trust for the latter and gave the school land half the status of school lands as regards moneys arising therefrom subject to be added to by any future express or implied determination to further limit the amount of land to be devoted to drainage purposes."

I have not understood the court as deciding that such determination had been made.

There are two tracts of said swamp lands which require special mention because of legislative action relative to them.

Ch. 49, Laws 1897, provides that "The commissioners of the public lands are hereby authorized and directed to withdraw from sale the southwest quarter of the southeast quarter of section twenty-two (22), township seventeen (17) north, of range two (2) east, and to set aside said land for the perpetual use of the Wisconsin military reservation." The land described was partitioned to the normal school fund in 1865. As the act is unconstitutional and void, the land still remains part of the normal school fund.

Ch. 293, Laws 1899, provides that "The commissioners of the public lands are hereby authorized and directed to withdraw from sale the northwest quarter of the northeast quarter of section twenty-one (21), township seventeen (17), north, of range two (2), east, and to set aside said land for the perpetual use of the Wisconsin military reservation." This land was never partitioned to either the normal school fund or drainage fund, but belonged, prior to the act of 1899, one half undivided to each fund. While the act was void and ineffectual as an attempt to dispose of the land for an unauthorized purpose, it evidenced the decision of the legislature that it was not necessary for drainage, and the character of the half belonging to the drainage fund was changed from drainage to school fund lands, and it now belongs to the normal school fund.

Two loans were made of normal school funds secured by mortgages. The mortgages were foreclosed and the property

bid in for the state and a sheriff's deed issued to the state for the same.    Said lands belong to the normal school fund and are described as follows: Lot nine (9), block nineteen (19), in W. M. Dennison's addition to the city of Watertown, and lots 3, 4, 5, and 8 of block 251 in the village (now city) of Manitowoc.

### Indian reservations—Lands conveyed to state.

Some of the lands patented by the United States to the state of Wisconsin as included in the grant of swamp lands, act of 1850, are located within Indian reservations.    A claim is made in behalf of the Indians that they have a prior title to the lands, or right of possession with right to remove the timber.    The validity of that claim is not involved in this case.    But the question to what fund the lands, if the state's title is sustained, or what it may receive in lieu of the lands, belongs, is involved.    The reservation in which the lands are situated, for which the state has patents, is not within the forest reserve as originally defined by the act of 1905, but was brought within it by an amendment in 1911.    The lands are all within the provisions of the act of 1903.    And ch. 96, Laws 1907, authorizes the commissioners of public lands to convey to the United States all the state's right, title, and interest in said lands, on receipt of the full appraised value of the lands and timber, and provides that the money received "shall be paid into the state treasury and, except when otherwise disposed of by constitutional provision, shall constitute a part of the forest reserve fund."    These lands and all received for them, directly or indirectly, belong to the normal school fund when the legislature has decided that none are necessary for drainage.    For reasons hereinbefore stated, I find and report that whatever right, title, or interest the state has in said lands belongs to and constitutes part of the normal school fund.    A description of said lands is contained in Schedule D.

*Indian reservations—Lands not conveyed to the state.*

Some lands within Indian reservations not conveyed are claimed by the state to be within the grant of 1850. I understand that the reason why patents have not been issued for them is that an adverse claim is made to them in behalf of the Indians and some are not admitted to be swamp lands.

Has the legislature decided that said lands and the proceeds to be derived from them were not necessary for reclamation?

The acts of 1903 and 1905 relative to state forest reserve mention only "lands belonging to the state" and "all public lands remaining unsold." Is this language to be construed as meaning only such as have been patented or all such as the state had title to of any kind?

In *State ex rel. Parsons v. Comm'rs,* 9 Wis. 236, the act of 1850 was construed, and it was held that the title to the lands remained in the United States until patents were issued, and until patent issued the state had no right to sell them. The same construction was adopted by the United States supreme court in *Michigan L. & L. Co. v. Rust,* 168 U. S. 589, 18 Sup. Ct. 208. The state officials never offered the lands for sale before patented. The language of the act of 1905 is, "The sale of all lands belonging to the state north of town 33 shall cease" and *"such* lands . . . shall constitute the state forest reserve." And the language of the act of 1903 is "all public lands remaining unsold, and all lands so withdrawn from sale, . . . shall constitute the state forest reserve." Considered alone, these acts appear to cover only lands to which the state had patents and legal title. If this is a correct construction, neither act is a decision by the legislature as to the necessity for using for reclamation swamp lands for which patents may thereafter be obtained.

Are these lands within the provisions of ch. 96, Laws 1907? Its language is, "all state lands . . . within any of the sev-

624 SUPREME COURT OF WISCONSIN. [Apr.

State ex rel. Owen v. Donald, 162 Wis. 609.

eral Indian reservations in Wisconsin." In view of the decision of the supreme court that the state did not own the swamp lands before patent issued, and the action of the legislature and state land commissioners in not treating such lands as state lands, I have construed the language "state lands" as including only those swamp lands for which the state had patents, and treated the state's interest in these lands as belonging one half to the normal school fund and one half to the drainage fund.

### Other claims for lands and money.

The state claims from the United States other lands than have been conveyed to it, aside from those in Indian reservations, and more money than it has received, based on the acts of 1850 and 1855. Provision has been made for the prosecution and settlement of such claims. Ch. 624, Laws 1915. I find no action by the legislature relative to such claims that has had or can have the effect of creating any uncertainty or confusion as to which funds they belong. As the decision of the legislature now stands, they belong one half to the normal school and one half to the drainage fund.

### Reservations in lands conveyed.

Ch. 374, Laws 1909, provides that "Whenever the state of Wisconsin shall hereafter convey in any manner whatsoever any of its lands, the conveyance thereof shall be subject to the continued ownership by the state of all minerals" and of all mining and water-power rights. Patents since issued have contained exceptions and reservations of minerals and such rights. All such reserved rights in swamp or indemnity lands belong to the normal school fund. And such minerals or rights in any lands which belonged to either of the other constitutional trust funds belong to the fund to which the land belonged.

*Lands sold on contract.*

Some swamp and indemnity lands have been sold on contract and have not been fully paid for.   The interest in said lands and the balance unpaid on said contracts I have treated as belonging to the normal school fund, as all sales and contracts were made since 1910.

Schedule F contains a description of all of said lands lying north of township thirty-three (33) and being within the forest reserve as defined in said act of 1905, with dates of sale and contracts and the amount unpaid on each contract.   Each tract that had been partitioned to the normal school fund under the act of 1865 is designated on said schedule by the letter N, and each tract partitioned to the drainage fund is designated by the letter D, and each tract not partitioned between said funds is designated by the abbreviation "Ind."

It shows the amount unpaid on the lands marked D is.... $9,059 00
It shows the amount unpaid on the lands marked N is....  9,245 00
It shows the amount unpaid on the lands marked "Ind." is   5,821 00

$24,125 00

Schedule G contains a description of all of said lands lying south of township thirty-four (34), and shows the same facts in the same manner relative to the contracts therein referred to as is shown by Schedule F relative to the contracts referred to in it.

It shows the amount unpaid on lands marked D is.........   $847 00
And the amount unpaid on lands marked N is.............  1,496 00.

$2,343 00
It shows no indemnity lands.

*Money in the treasury not credited.*

Some of the indemnity lands were partitioned between the drainage fund and the normal school fund under the provisions of the act of 1865.   Those acquired later were not partitioned, but when sold the proceeds paid into the state treasury, credited to a fund designated "indemnity land

fund" and transferred from that fund one half to the normal school fund and one half to the drainage fund. The amount so paid into that fund during the fiscal year ending in 1903 was $1,400.74. It has never been transferred to the other funds, and belongs one half to the normal school fund and one half to the drainage fund.

The schedules referred to—A to K—are so fully described herein that an inspection of them by the court would inform it of no additional fact except the descriptions of the several subdivisions. Such descriptions would not aid the court in determining whether the report and accounting should be confirmed or modified. The schedules are made from facts contained in the records of the state land office. Should any be lost or destroyed, they could be reproduced from said records from the description of the schedules contained herein. There are no adversary parties to this proceeding. The judgment based upon this report, so far as said schedules cut any figure, merely determines the status of the state's property as between different funds for the guidance of the legislature and state officials. The state land commissioners are state officers, with their office in the same building as that of the clerk of this court, and I see no reason why the court should not permit such part of the record in this proceeding as said schedules constitute to remain in the state land office. They would occupy considerable space in the office of the clerk of this court, while the land office would naturally be resorted to for the descriptions contained in them. Sec. 2416, Stats., makes it the duty of the clerk of this court to have and keep the custody of records and papers thereof, but it does not require him to keep them in any particular place in the state house, nor does it control the action of the court relative to them.

I have identified said schedules by indorsement and signature as those referred to in this report, and leave them in said land office subject to the order of the court as to their custody, should any be made.

The following facts in addition to those before stated appear from said schedules:

|  | Acres. | Acres. |
|---|---|---|
| Of the lands described in Schedule A, there are | | |
| north of township 33 | 58,336.71 | |
| And south of township 34 | 4,725.25 | |
| Total | | 63,061.96 |
| Of the lands described in Schedule B, there are | | |
| north of township 33 | 69,417.23 | |
| And south of township 34 | 6,376.40 | |
| Total | | 75,793.63 |
| Of the lands described in Schedule C, there are | | |
| north of township 33 | 11,402.71 | |
| And south of township 34 | 1,183.99 | |
| Total | | 12,586.70 |

## Indebtedness of the general fund.

The order requires the referee to include as an item in the accounting "any indebtedness from the general fund to any trust fund, giving due credit for all proper disbursements chargeable to the trust funds." The opinion makes it clear that the general fund is to be charged, in ascertaining said indebtedness, with all moneys belonging to the trust funds actually paid into and used as part of the general or forestry fund. It does not specially mention as items to be charged against the general fund amounts equal to the value of trust fund property lost to the fund by unlawful act of the legislature or state official, the property never having gone into any other fund. It does not appear that the fact of such losses was known to the court. The order requires the accounting to "include all matters not specifically mentioned so far as necessary to cover the field discussed in the opinion and carry out the intent thereof, guided by such opinion." The opinion says the accounting is "to determine the legal and equitable status of the claims of the trust funds upon the general fund." Such claim is treated as an indebtedness of the state. The opinion further says: "The state is liable to make good the misuse [of the trust fund] the same as any trustee is responsible for money intrusted to his care." The princi-

pal object and purpose of the proceeding is to have the integrity of the trust funds fully restored.     To do this, all that the fund has lost through action of the legislature in dealing with it must be made good and paid out of the general fund, whether or not that or any other fund ever received it.

I have construed the opinion of the court as holding that the general fund is chargeable with whatever amount a constitutional trust fund has lost by direction of the legislature followed by state officials, whether the money or property lost was diverted to some other fund and used by the state, or given away without consideration.

The order is that the accounting shall include all dealings with the trust funds of the date of ch. 367, Laws 1897, and so long prior thereto as practicable, not earlier than the decision under ch. 537, Laws 1865.

I have examined all the acts of the legislature, general and private and local laws, between said dates, relating to swamp or indemnity lands.     I have found many authorizing unlawful use of portions of the drainage fund.     These acts I have classified under three heads:

1. Those authorizing use for other purposes than drainage, but giving no data for determining how much of the fund the act applied to.

2. Those authorizing the use of a portion of the fund for a number of specified purposes, including in those specified schools and drainage, and presenting the same uncertainty found in the first class as to the amount of the fund the act applied to.

3. Those when certain specific drainage fund lands were given away for purposes of building bridges; to private corporations; to aid in improving streams for log driving; and to counties to give as bonus to railroad companies.

To ascertain the amount of the funds unlawfully diverted by action taken under the provisions of the first and second classes of acts, and to ascertain what lands and funds the leg-

islature decided by such enactments were not necessary for drainage, would require the examination of county and town records at great expense and with uncertainty as to their containing the desired information, and I have treated such investigation as not practicable.

The third class I have construed and treated as decisions by the legislature that the lands disposed of were not necessary for drainage purposes, and treated the state or general fund responsible to the trust fund to which they belonged for their value at the time they were wrongfully converted and lost to the fund.

I have found the following cases in the third class:

Ch. 400, P. & L. Laws 1866, named and appointed three commissioners to build a bridge across the Menominee river. It provided that to aid in the construction of said bridge there should be granted to said commissioners swamp lands in the town of Marinette set apart for drainage purposes, not more than ten sections, patents to be issued by the state land commissioners when the lands were selected. Pursuant to that act, patents were issued for 5,587.74 acres of said land during the years 1867 and 1868, the last patent being dated June 4, 1868. The lands were at that time valued at and being sold for $1.25 per acre, and were worth at that time $6,984.70. The state or general fund became indebted to that amount at that time to the fund to which the lands then belonged, and the lands having become school fund lands by reason of the decision of the legislature that they were not necessary for drainage, and the constitution, that indebtedness was and is to the normal school fund.

The judgment specifies as items to be included in the accounting what the proceeds of trust fund lands wrongfully diverted would have earned had the same been diverted to the trust to which they belonged. As the lands were given away and no proceeds derived from them, the case does not fall within the language of the judgment, literally construed, but

I have construed the opinion and law as holding the general fund liable to the same extent when the property is given away, and that the state or general fund became indebted for what an amount equal to the value of said lands would have earned as part of the fund to which it belonged, and I find as a fact that it would have earned at the least three and one-half per cent.

The normal school fund is a permanent fund, "the interest of which and all other revenues derived from the school lands shall be exclusively applied" to the support and maintenance of schools and libraries. No part of it is added to the principal. Const. art. X, sec. 2. As explained above, in carrying out the intent of this provision the state has kept a separate account, designated the "normal school fund income," to which fund or account all income from the principal fund properly belongs. Any indebtedness from the state or general fund for loss of income as interest or earnings would be to this fund.

Ch. 261, Laws 1880, provided that all swamp lands in Marathon, Clark, and Shawano counties, and in designated parts of Oconto and Chippewa counties, patented to the state prior to January 1, 1880, and set apart as drainage lands, were granted and disposed of to said counties, to each severally the lands within its borders, with power to sell, dispose of, and convey the lands to any railroad corporation that should construct and equip certain railroads. Pursuant to the provisions of said act, 63,622.55 acres were patented to said counties April 12, 1880. Said lands were valued and being sold at an average of $1.25 per acre at that time and were worth $79,528.19. Said amount as part of the normal school fund would have earned at least three and one-half per cent. Under the construction of the law as applied above to the Marinette lands, I find the general fund indebted to the normal school fund $79,528.19, and to the normal school fund income account in an amount equal to the interest on

said amount at three and one-half per cent. from April 12, 1880.

Ch. 334, Laws 1867, created the Lemonweir Improvement Company, a corporation with power to improve a river so as to facilitate the running of lumber, logs, etc. To enable the corporation to make such improvements, the act provided that there was granted to it an amount equal to twelve sections of drainage fund lands, to be selected in four counties named, on completion of said improvements. Pursuant to the provisions of said act, 7,640.20 acres of said lands were conveyed to said corporation during the year 1868.

Said lands were valued and being sold at the time for $1.25 per acre and were worth $9,550.25. I find that the general fund—the state—became indebted to the normal school fund for that amount. That said amount, as part of said fund, would have earned at least three and one-half per cent. from that date, and that the state or general fund is indebted to the normal school income fund for the amount of said interest, unless paid.

It will be noticed that I have treated the lands conveyed pursuant to ch. 400, P. & L. Laws 1866, ch. 261, Laws 1880, and ch. 334, Laws 1867, as lost from the trust fund—given away by the legislature. While it is well settled that "no trust attached to and traveled with the title" by reason of anything in the grant from the United States, the question may arise whether that is true as to the lands that became constitutional trust fund lands by operation of the constitution. Could the legislature give title to the lands to a grantee who paid nothing for them, the conveyance showing on its face by recital—as those given for the lands in question did—that such was the fact? A deed executed by an attorney in fact which shows on its face that the attorney exceeded his authority in executing it, passes no title. *Meade v. Brothers,* 28 Wis. 689. Probably the land commissioners could legally and should have refused to execute the conveyances.

The state could have had them canceled by judgment of a court. But the conveyances have stood unchallenged from thirty-five to forty years. All right of the state to have them canceled by judgment of a court is barred by the statute of limitations. See *State v. Milwaukee,* 152 Wis. 228, 138 N. W. 1006. And without doubt most of the lands have been occupied more than ten years by subsequent purchasers claiming under written instruments. If the title is still in the state, the lands belong to the trust fund and there is no indebtedness arising from the state's dealing with them, and it would be the duty of the state to have its title to said lands cleared from the cloud upon them occasioned by said unauthorized conveyances, so far as present claimants under them are not protected by statutory limitations or laches.

## Diverted funds.

Before the lands covered by the grant by Congress September 28, 1850, were identified, more than 70,000 acres had been sold or otherwise disposed of by the United States. To indemnify the state for the loss of said lands, Congress, by act of March 2, 1855, gave to the state all moneys received by the United States for such of said lands as it had sold and been paid for, and an equal quantity of other lands to indemnify the state for those lost for which the United States had received nothing—as those entered on land warrants. These lands and funds, being part of the grant of 1850, were given and received on the same terms and subject to the same trusts as the lands to which the state acquired title under the act of 1850. If the same trust for reclamation did not follow the indemnity lands, then they all belonged to the school fund and the state is indebted to that fund for all such lands and proceeds of such sales as she has given to the drainage fund. There may be a question as to whether the state received the money on the same terms and conditions as it did the lands. If not, it was a mere grant of so much money. If so, are such moneys within the provision of the constitution (art. X, sec. 2), "all moneys arising from any grant to the state where

the purposes of such grant are not specified"? Does the term "grant" include gifts of money as well as lands, or does it include lands only? If it includes moneys, and there is no trust specified, the money all belonged to the school fund. If the constitution referred to lands only, then the trust must be worked out through the grant of 1850, the money being the proceeds of the land sold. The United States, at the time the constitution was adopted, owned vast quantities of land. It was granting them liberally to the new states for specified purposes. It is quite probable that land grants were the only kind of grants that the framers of the constitution thought of getting. But that would not indicate that they used language limiting the operation of the constitution to that class of grants. In its larger sense, anything given by one to another is a grant. And the term is usually used in reference to things given by government. It is also frequently used as meaning only gifts of real estate, as in sec. 2077, Stats. *Tobin v. Tobin,* 139 Wis. 494, 121 N. W. 144. Its meaning in any particular connection is a matter of construction.

The term "grant" is used in the constitution as including gifts of other things than land. Art. VIII, sec. 10: "Whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works." The opinion points out the fact that a large school fund was a prominent thought and purpose of the constitutional convention. They put the five per cent. cash grant to the state, by the same section of the constitution we are considering, into the school fund, indicating a purpose to put all unfettered gifts of property into that fund, and not simply gifts of land. I think the term was used with its broader meaning. Should Congress or some wealthy citizen of the state donate to it a sum of money without specifying any purpose for which it should be used, I think this provision would put it into the school fund.

But I think that the proper construction of the acts of

Congress is that the money received by the United States for the lands and turned over by it in place of the lands, the title to which had vested in the state, was part of the grant and impressed with the same trusts as the lands. It was clearly treated and considered as such by Congress and the state. The reason for giving the money is stated in the act granting it, and shows that it was given as part of the grant. The state, by the acts of 1865 and 1869, treated it as part of the grant and made the same provision for dividing it as it did for dividing the lands. If the term "grant" is to be construed as meaning only grant of lands, the money turned over in lieu of the lands was money arising from the grant within the meaning of the constitution.

The amount of money paid by the United States under this act of 1855 was $141,878.05. One half of it was paid into the normal school fund. The other half the legislature first provided should be paid to the drainage fund. It was afterwards, pursuant to provisions of ch. 185, Laws 1893, paid to the normal school income fund. The act of the legislature making such appropriation followed its decision, evidenced by the act, that the amount was not necessary for drainage or reclamation of the swamp lands, which decision made it part of the normal school fund. And it was a misuse of it as part of that fund to take it from the principal and spend it.

I have treated the act as creating a debt against the general fund of $70,939.02. It was paid during the fiscal year ending September 30, 1893. As part of the normal school fund it would have earned three and one-half per cent. per annum since that date, and the general fund is indebted to the normal school income fund for an amount equal to that interest, unless it has been paid.

Ch. 367, Laws 1897, provided that "The moneys received for the sale of lands shall be covered into the general fund, except when otherwise disposed of by constitutional provision."

The land commissioners construed this provision (1) as relating only to sales thereafter made, and not including money received as payments on contracts for lands sold before that time; (2) and, at first, as applying only to swamp lands, but as applying to all such lands. No moneys received for the sale of indemnity lands were paid into the general fund before 1904. The act was never construed as including receipts from the sales of lands belonging to the university, agricultural college, or school funds.

Commencing with the fiscal year ending in 1898, all receipts for swamp lands sold during that year were paid into the general fund. This continued until the fiscal year ending in 1906. During that and all subsequent years all moneys received from the sale of said land located within the state forest reserve, as defined by the act of 1905, have been paid into the forest reserve fund, and all received for sale of said lands not in said reserve have been paid into the general fund.

Schedule I shows the amounts paid during each year into the general fund received from sale of such lands as were partitioned under the act of 1865 to the normal school fund. The general fund became indebted to the normal school fund at the end of each year for the amount so received during the year, probably for the amount of each item when paid in. But as these items were numerous and many quite small, I have considered it sufficiently accurate to take the amounts by years.

Schedule II shows the amounts paid into said fund from the sales of land which were partitioned to the drainage fund under the act of 1865.

For the amounts shown in Schedule II down to and including the year ending in 1903, the general fund became indebted to the drainage fund.

I have above stated my reasons for deciding that the effect of the act of 1903 was to change all unsold drainage fund lands from that class to the school land class. For all moneys re-

·ceived by the general fund from the sale of lands after the year 1903, as shown in Schedule II, the general fund became indebted to the normal school fund.

All receipts from the sale of indemnity lands made after the year ending in 1903 were paid either to the general fund or to the forest reserve fund. Schedule III shows the amounts paid into the general fund from sales of indemnity lands never partitioned. Had there been no modification of the decision of 1865, the general fund would have become indebted to the normal school fund for one half of said amounts and to the drainage fund for the other half. But for the reasons given above for treating all the unsold swamp and indemnity lands as normal school lands since the act of 1903, I have treated the general fund's indebtedness for the whole amount as indebtedness to the normal school fund.

·Schedule VII shows the amounts paid into the forest reserve fund from sales of indemnity lands not partitioned. I have treated all of said lands as belonging to the normal school fund when sold, and the forest reserve fund, or general fund, indebted to the normal school fund for said amounts.

Schedule VIII shows the amounts paid into the forest reserve fund from sales of swamp lands, which, according to the partition of 1865, belonged to the *normal school* fund. The forest reserve fund—or general fund—became indebted to the normal school fund for said amounts.

Schedule IX shows the amounts paid into the forest reserve fund from sales of swamp lands which had been partitioned under the act of 1865 to the drainage fund. For reasons above stated I have treated the forest reserve fund, or general fund, indebted for said amounts to the normal school fund.

There was much valuable timber on many of the swamp and indemnity lands. Some was cut and removed by trespassers and some sold. There has been collected from said trespassers and for said timber sold large amounts. I have treated the amounts collected as belonging to the same funds to which the lands belonged.

Schedule IV shows the amounts collected for trespasses upon and timber sold from swamp lands partitioned under the act of 1865 to the normal school fund and paid into the general fund. I have treated said amounts as an indebtedness from the general fund to the normal school fund.

Schedule. V shows the amounts collected for trespasses upon and timber cut from swamp lands partitioned under the act of 1865 to the drainage fund and paid into the general fund. For all of said amounts collected for trespasses committed or sales made prior to the act of 1903, I have treated the general fund indebted to the drainage fund. For all other of said amounts I have treated the general fund indebted to the normal school fund.

Schedule VI shows the amount collected for trespass upon and timber sold from indemnity lands not partitioned between the normal school and drainage funds under the act of 1865 and paid into the general fund. As the whole amount was collected during the year ending in 1904, I have treated the general fund as indebted to the normal school fund for the entire amount.

Schedule X shows the amounts collected for trespasses upon and timber sold from swamp lands partitioned under the act of 1865 to the normal school fund and paid into the forest reserve fund. The forest reserve fund—or the general fund—is indebted to the normal school fund for said amounts.

Schedule XI shows the amounts collected for trespasses upon and timber sold from swamp lands partitioned under the act of 1865 to the drainage fund and paid to the forest reserve fund. Because of the acts of 1903 and 1905, I have treated all of said lands as belonging to the normal school fund during the years mentioned in said schedule, and the forest reserve fund—or general fund—as indebted to the normal school fund for all of said amounts.

Some of the swamp lands were sold on contract, only part of the purchase price being paid at the time of the sale. As

the deferred payments became due and were paid, they were paid or credited during several years part to the general fund and part to the forest reserve fund.

Schedule XIII shows the amounts of principal on contracts for the sale of swamp lands partitioned to the *drainage fund* under the act of 1865 collected and paid into the general fund. All sales evidenced by said contracts were made after 1903. I have treated the general fund as indebted to the normal school fund for said amounts.

Schedule XIV shows the amounts of principal falling due on contracts for swamp lands partitioned to the normal school fund under the act of 1865 and paid into the general fund. I have treated the general fund as indebted to the normal school fund for all said amounts.

When the lands were sold on contract the deferred payments drew interest. The question arises whether such interest is part of the "proceeds of the land" or "moneys arising from the sale of such lands," within the meaning of the constitution, and by it made part of the permanent fund which is to be invested and not spent. When the facts presented the questions it seemed to me that such interest was made by the constitution part of the permanent fund. But I find that the legislature of 1849 put a different construction upon the constitution and treated the deferred payments as loans and provided that the interest should be paid into the income fund. That construction has always been followed and all such interest has been paid into the income fund when not diverted to the general or forestry fund. I have given the benefit of the doubt to the constitutionality of the action of the legislature, and treated the indebtedness of the general fund for such interest to be to the income fund rather than to the principal. Sec. 61, ch. 24, R. S. 1849; sec. 246, Stats. Should the other construction be adopted, there would be debts from the general fund to each of the four constitutional trust funds for all the interest that has been col-

lected on deferred payments on contracts, as the legislature could not constitutionally provide that these should be taken from the principal and spent as income.

Schedule XV shows the amount of interest collected on contracts for the sale of swamp lands partitioned to the normal school fund under the act of 1865 and paid into the general fund. I have treated the general fund as indebted to the normal school income fund for all said amounts.

Schedule XVI shows the amounts of interest on contracts for sale of swamp lands partitioned to the drainage fund under the act of 1865 collected and paid into the general fund. All said contracts were made after 1905, and I have treated the general fund as indebted to the normal school income fund for all of said amounts.

Schedule XVII shows the amounts of interest on contracts for the sale of swamp lands partitioned to the normal school fund under the act of 1865 collected and paid into the forest reserve fund. I have treated the general fund as indebted to the normal school income fund for said amounts.

Schedule XVIII shows the amounts of interest on contracts for the sale of swamp lands partitioned to the drainage fund under the act of 1865 collected and paid into the forest reserve fund. All of said sales were made after the act of 1903, and I have treated the general fund as indebted to the normal school income fund for all of said amounts.

Schedule XIX shows the amounts of principal falling due on contracts for sale of swamp lands partitioned to the normal school fund under the act of 1865 and sold on contract, collected and paid into the forest reserve fund. I have treated the general fund as indebted to the normal school fund for all of said amounts.

Schedule XX shows the amounts of principal falling due on contracts for sale of swamp lands partitioned to the *drainage* fund under the act of 1865 collected and paid into the forest reserve fund. All of said sales were made after the

act of 1903, and I have treated the general fund as indebted to the normal school fund for all of said amounts.

The legislature has at different times taken large sums from the four constitutional trust funds and used them for other state purposes, giving the transactions the form of a loan by issuing certificates of state indebtedness for the amounts. These certificates the court adjudged void, and the state or general fund indebted for the respective amounts taken to the respective funds. The amounts of such indebtedness are as follows: To the university fund, $111,000; to the agricultural college fund, $60,600; to the school fund, $1,563,700; to the normal school fund, $515,700. The state has always paid to the respective income funds interest at seven per cent. on the amount of said indebtedness. During the year 1901, $840 received from the sale of school lands was paid into the general fund, probably by mistake. It has never been transferred to the school fund. Added to the above, it makes the general fund indebtedness to the school fund $1,564,540.

Ch. 276, Laws 1882, provided that the state land commissioners should convey to H. M. Fuller and others all the state's right, title, and interest in certain swamp and overflowed lands in Ashland county for a consideration of $1.25 per acre. Pursuant to said act lands were conveyed July 20, 1882, for which the grantees paid $3,850.37. The money was paid into the general fund and used for general state purposes. The lands were in an Indian reservation and had never been patented to the state. All the state's right, title, and interest in the lands was derived under the grant of 1850, and said money belonged to the normal school and drainage funds, one half to each. And the general fund became indebted to the normal school fund July 20, 1882, in the sum of $1,975.18½, and to the drainage fund $1,975.18½. I have considered the status of those lands under the head of "Indian reservation lands not conveyed to the state."

### Credit for disbursements.

The order requires that, in ascertaining the amount of indebtedness from the general fund to any trust fund, due credit shall be given for "all proper disbursements chargeable to such trust funds."

I find nothing in the opinion indicating what class of disbursements are to be so credited. If this were an action and accounting between two separate parties, one a trustee, the other the *cestui que trust,* I would find in the law defining the rights of a trustee rules by which to test each disbursement. The accounting is not between different parties to determine their respective rights in certain property or a fund, or to settle mutual accounts; and ascertain the balance due from one to the other. The case is not one of one party holding and managing a property or fund as a simple trustee for the benefit of another person as *cestui que trust.* The accounting is between different funds, all belonging to one and the same party, the state, which is as fully the beneficiary of the fund as the trustee. The only trust which cuts any figure in the accounting is one created by the constitution, and designated in the opinion as a "constitutional trust." In other opinions the state is referred to as a *quasi-trustee* of the school funds created by the constitution (*State v. Milwaukee,* 158 Wis. 564, 575, 149 N. W. 579). In what sense and to what extent is the state a trustee of the constitutional trust funds?

The people, in the direct exercise of their sovereign power, as their own lawmakers, provided in the constitution that certain moneys and properties belonging to the state should constitute a school fund, the principal to be kept intact and the income only to be expended for school purposes. By the same instrument they vested in the legislature all their legislative power not directly exercised by themselves, but with no power to reverse or alter the laws that they themselves

had made.   The legislature,therefore, had and has no power
to make any other use of the constitutional trust funds than
that provided for by the constitution.   Over all funds and
property, whether held by the state in "its governmental
function" or in "its proprietary capacity" (*State v. Milwau-
kee,* 152 Wis. 228, 235, 138 N. W. 1006), the legislature
has full control except as limited by the constitution.   The
people might amend the constitution and do away with the
school fund.   It is only because of the self-imposed limita-
tion upon the use that the state will make of a portion of its
property that it can be said to hold it in trust.   This is cer-
tainly true as to all coming to the fund under the swamp
land grant and fines, forfeitures, and escheats.   The consti-
tutional trust attached to the state's title to the trust fund
is only a limitation on the power of the legislature, depriving
it of power to use for any other purpose than that named.

It may be that as to lands granted to the state for the ex-
press purpose of schools there is a trust feature connected
with the title that would enable the grantor to call the state
to account and forfeit the state's title should it make other
use of the lands.   But no such question is involved in this
case.   The United States is not a party to this proceeding.
We are considering only the state's dealing with its own prop-
erty, in violation of its own constitutional provisions, and so
far as the constitution creates a trust all the trust property
stands on the same footing.   It is for the state to decide
whether, when it establishes a constitutional trust as to some
of its own property, it will pay out of other funds the ex-
pense of caring for and administering the trust fund or de-
duct from such fund such expense.   This is a question of the
construction of the constitution.   If it is the intent of the
constitution that a constitutionally created trust fund shall be
taken care of by the state from other funds, the intent must
be the same as to all property in such fund whether donated
to the state for that purpose or not.   In determining whether,

in the accounting between the general fund and a trust fund, the general fund should be credited with all disbursements made for the protection and administration of the trust fund, the question is not what would be the rule if the accounting were between an ordinary trustee and another person as *cestui que trust,* but what is the meaning of the constitution creating the trust. The state is the owner of all trust fund property and all general fund property. It can devote its general fund to the maintenance of schools as well as its trust fund property. In paying for the care of the trust fund property out of the general fund it is only paying out money for itself for one of its governmental functions. I have construed the constitution as meaning that expense of the care and administration of the trust fund property should be borne by the state or general fund. If this is not the meaning of the constitution, I know of no rule to apply except that governing the relation of trustee and *cestui que trust,* which would make the entire expense of the state land department in caring for and administering the trust funds a charge *pro rata* against those funds.

Some of my reasons for this construction of the constitution are:

1st. It has always been the construction placed upon it by the legislature and state officials. The expenses of the land department have never been taken out of the trust funds or their income. The statute has always provided that "all expenses incurred . . . in the care, protection and sale" of constitutional trust fund land should be paid out of the general fund. Ch. 56, Laws 1866; sec. 190, Stats. Ch. 118, Laws 1915, makes an appropriation from the general fund to the state board of forestry for the protection from forest fires of any lands owned by the state north of town 33.

2d. When it is only net proceeds, after deducting expenses, that are to go into the fund and remain part of it, it is so expressed, the distinction being made between the whole

and the net.   The language of sec. 2, art. X, of the constitution is "the proceeds of all lands" and "all moneys arising from any grant to the state" and the "clear proceeds of all property that may accrue to the state by forfeiture or escheat," and "the clear proceeds of all fines."   "Clear proceeds" means net proceeds (*State v. De Lano,* 80 Wis. 259, 49 N. W. 808).   It is "the entire proceeds" and "all moneys" arising from grants and only net proceeds from other property that constitute the fund.   The requirement of the constitution (art. X, sec. 8) is that the commissioners "shall invest *all* moneys arising from the sale of such lands," and (art. X, sec. 2) "the interest . . . and all other revenues derived from the school lands shall be exclusively applied to" support and maintenance of schools.

3d.   If the framers of the constitution meant that the expense of caring for the property and administering the fund should be a charge against the fund, it is reasonable to suppose that they would have so provided in express terms.

4th.   It is expressly held in the opinion in this case that "whatever is reasonably required to care for the trust lands of any character, as regards fire hazard, or trespassing or realizing on annual forest crops naturally produced thereon, and to utilize the dead, down, dying, and mature timber for the benefit of the fund for which the lands are held, may doubtless be done and at the general public expense."   This would not be true if the constitution contemplated that such expense should be a charge against and paid out of the trust funds.   The judgment refers to the state's "constitutional duty to conserve" the lands.

Money has been expended under the direction of the state forester and paid out of the forest reserve fund in providing means for the protection from fire of lands intended to be reserved as a permanent state forest.   The swamp and indemnity lands owned by the state have been protected to some extent by such means.   I have discovered no means of ascer-

taining to what extent. Construing the constitution as I
have, as requiring the state from its general funds to take
care of and administer its constitutional trust funds, and not
at the expense of the principal of the fund, I have not con-
sidered any disbursement made from the general or forest re-
serve fund in whole or in part for the protection and care of
the constitutional trust fund lands as chargeable to such trust
fund within the intent and meaning of the opinion of the
court, and I have only credited the general fund with amounts
paid from it to the constitutional trust fund or the income
fund connected with it.

### Income.

The judgment is that there shall be included in the ac-
counting the "income which such proceeds would have earned
had the same been devoted to the trust to which they be-
longed," as well as the actual income earned.

As I have explained above, the constitutional trust funds
are permanent funds; the principal to be kept intact but not
increased by its earnings, all of which are to be exclusively
applied to the support and maintenance of schools and li-
braries. Had moneys wrongfully paid into the general or
forest reserve fund been in the fund to which they belonged,
their earnings would have gone into the income funds and
been spent annually. Any indebtedness for the loss of such
earnings would be to the income fund. The legislature has
for many years made annual appropriations to the normal
school fund income. These have far exceeded the amount of
the general fund's indebtedness to the income fund. I have
presumed that, in determining the amount it would appropri-
ate each time to the fund, account was taken of the amount of
income being derived from the permanent fund, and had the
amount of diverted money been in the fund producing an
income the appropriation would have been less by the amount
that the income would have been increased, and that all in-
debtedness of the general fund to the income account has

been paid.   If we indulge in the opposite presumption, that the appropriations would have been no less had the principal of the fund been kept intact, and treat the indebtedness as technically not paid, we would simply find an indebtedness which the legislature could provide for paying by enacting that the next appropriation should be for that express purpose, if the appropriation should be as large as that made in 1915.   If less than that, the debt would be paid by two average appropriations.

Taking this view of the situation, I have not deemed it necessary to figure out the exact amount the smaller diverted items would have earned.   A few of the larger ones will illustrate the situation.   Figured at three and one-half per cent. to June 30, 1915, the earnings on items in

| | |
|---|---:|
| Schedule    I would be ............................. | $92,001 11 |
| "          II    "    " ............................. | 41,995 85 |
| "         III    "    " ............................. | 23,918 59 |
| "         VII    "    " ............................. | 16,980 08 |
| "        VIII    "    " ............................. | 19,114 82 |
| "          IX    "    " ............................. | 19,354 45 |
| On value of lands given away......................... | 123,281 27 |
| On $70,939.02 taken from principal and spent as income.. | 54,622 92 |
| | $391,269 09 |

It is apparent without figuring that the interest on all the other items could not make the total exceed........... $425,000 00
Add to this the general fund's indebtedness to the income fund for the items of interest received by the general fund and forest reserve fund on deferred payments as per Schedules XV, XVI, XVII, and XVIII.............   8,616 03
And receipts for hay, grass, and rent, as per Schedules XXI and XXII, which I treat as indebtedness to the income fund ........................................   3,223 00

We have a total indebtedness to the normal school fund of $437,839 03

The appropriations made to such income fund by sub. 32 of sec. 172—54 in ch. 633, Laws 1915, were $458,751; the appropriations made in 1909 were $206,300 (ch. 320); and those made in 1907 (ch. 350, ch. 299, and ch. 505) aggregate $365,000.

Since the organization of the forestry department considerable sums have been collected for rent and hay and grass cut from swamp and indemnity lands.   A small amount has

been paid into the general fund, the balance into the forest reserve fund. The amounts are shown in Schedules XXI and XXII. This being revenue derived from the lands, belonged to the income fund. I have so treated it in the accounting.

### Drainage fund.

Schedules II and V show an indebtedness from the general fund to the drainage fund at the end of the fiscal year 1903 of $94,035.76, which with $1,975.18, one half paid by Fuller and others, makes the debt $96,011.94. Had the money been paid into the drainage fund and disbursed to the counties, as it would have been under the then existing statutes, no interest would have been earned. The legislature could probably control that fund, change the statute requiring its distribution among the counties, and hold it in the treasury for future use for drainage. If the act of 1897, ch. 367, is construed to mean that all moneys thereafter received from the sale of drainage fund lands shall not be distributed among the counties to be used for drainage, but shall become part of the general fund and be used for general state purposes, it evidences the decision of the legislature that no more of such lands or proceeds from sales of them are necessary for drainage, and all unsold lands and receipts from future sales became part of the normal school fund, and the general fund is indebted to the normal school fund for said $96,011.94. If the meaning of the act is simply that the drainage fund money should be placed in the state treasury and held there to be used for drainage purposes as the legislature might thereafter direct, the act would not amount to a decision that it was not necessary for drainage. As no express appropriation to any other particular use was made of such moneys as might be paid into the general fund, received from the sale of drainage fund lands, the act of 1897 has been construed by subsequent legislatures and the attorney general as simply requiring the money belonging to the fund to be held in the state treasury, and when occasion arose for

its use for drainage the legislature could provide for such use and transfer enough from the general fund to the drainage fund to meet the appropriation for drainage made by the legislature. Following this construction, the legislature has, in 1903 and since, appropriated to uses which it decided were reclamation, within the meaning of the act of 1850, moneys in the drainage fund and provided that moneys in the general fund received from the sale of swamp lands should be transferred to the drainage fund. In pursuance of such acts there were transferred from the general to the drainage fund the following amounts:

| | |
|---|---|
| During the fiscal year ending in 1905...................... | $15,907 46 |
| "      "      "      "      "      " 1912...................... | 50,000 00 |
| "      "      "      "      "      " 1913...................... | 31,000 00 |
| "      "      "      "      "      " 1914...................... | 25,500 00 |
| | $122,407 46 |

While there never was a permanent drainage fund, principal invested producing an income, the fund would be equitably entitled to what the general fund had derived from the drainage fund money. This would probably be two per cent., which banks paid on money deposited with them by the state treasurer. Adding interest on the several items shown in Schedules II and V which belonged to the drainage fund, and the amount would still be considerably less than said amounts transferred from the general to the drainage fund.

I have treated the general fund's indebtedness to the drainage fund as fully paid.

### All indebtedness is from the general fund.

The schedules show large amounts of trust funds paid to the forest reserve fund. The forest reserve fund, as above shown, is only in part a trust fund. Only such lands and moneys as have been given to the state in trust for a forest reserve are held in trust. The trust is created by the terms of the grants. It is in no sense a constitutional trust. All other moneys, lands, or other property in the forest reserve

fund belong to the state as property in the general fund not fettered by any constitutional or other trust. Any claim that a constitutional trust fund has for its property diverted to the forest reserve fund is a claim against the general fund. The order and judgment mentions no indebtedness from any fund except the general fund. While I have in separate schedules kept separate the items belonging to the normal school fund paid into the forest reserve fund, I have treated the amounts as creating indebtedness against the general fund.

A separate account has been kept by the forestry. department of all its dealings with property and moneys given to the state in trust for forestry purposes, and in making this accounting I have only dealt with that part of the fund which is not a trust fund.

The following are the schedules above referred to, numbered from I to XXII:

*Schedule I.* Amounts paid into general fund from receipts from sale of swamp lands partitioned to *normal school fund* under act of 1865. (The year named is that in which the fiscal year ended.)

| | | | |
|---|---|---|---:|
| Year 1898, amount | | ...................... | $45,091 40 |
| " 1899 | " | ...................... | 14,395 00 |
| " 1900 | " | ...................... | 19,403 00 |
| " 1901 | " | ...................... | 6,287 19 |
| " 1902 | " | ...................... | 3,300 00 |
| " 1903 | " | ...................... | 5,181 00 |
| " 1904 | " | ...................... | 39,560 25 |
| " 1905 | " | ...................... | 30,208 62 |
| " 1906 | " | ...................... | 11,255 00 |
| " 1907 | " | ...................... | 14,932 00 |
| " 1908 | " | ...................... | 13,065 00 |
| " 1909 | " | ...................... | 3,575 00 |
| " 1910 | " | ...................... | 3,428 00 |
| " 1911 | " | ...................... | 4,661 00 |
| " 1912 | " | ...................... | 3,409 00 |
| " 1913 | " | ...................... | 267 00 |

$218,018 46

NOTE.—$84 of said amount paid into said general fund during the year 1912 was for land the sale of which was canceled, and belongs to the party paying it. I have deducted it from the amounts received by the general fund, leaving the balance...................................... $217,934 46

State ex rel. Owen v. Donald, 162 Wis. 609.

*Schedule II.* Amounts paid into general fund from receipts from sale of swamp lands partitioned to the *drainage fund* under the act of 1865. (The year named is that in which the fiscal year ended.)

| | | | | | |
|---|---|---|---|---:|---:|
| Year | 1898, | amount | ............................. | $51,253 | 44 |
| " | 1899 | " | ............................. | 12,330 | 00 |
| " | 1900 | " | ............................. | 14,357 | 00 |
| " | 1901· | " | ............................. | 5,718 | 00 |
| " | 1902 | " | ............................. | 3,370 | 00 |
| " | 1903 | " | ............ $91,992 44 | 4,964 | 00 |
| " | 1904 | " | ............ | 32,583 | 52 |
| " | 1905 | " | ............ | 23,502 | 00 |
| " | 1906 | " | ............ | 10,290 | 00 |
| " | 1907 | " | ............ | 14,455 | 00 |
| " | 1908 | " | ............ | 15,965 | 00 |
| " | 1909 | " | ............ | 2,935 | 00 |
| " | 1910 | " | ............ | 4,265 | 00 |
| " | 1911 | " | ............ | 3,024 | 00 |
| " | 1912 | " | ............ | 2,310 | 40 |
| " | 1913 | " | ............ 110,087 92 | 758 | 00 |
| | | | $202,080 36 | $202,080 | 36 |

NOTE.—$144 of said sum paid to said fund during the year 1912 was for lands the sale of which was canceled and belongs to the party paying it. It should be deducted from the amount chargeable to the general fund.............. $201,936 36

*Schedule III.* Amounts received from the sale of indemnity lands which were never partitioned between the normal school and drainage funds, and paid into the general fund and not transferred to normal school or drainage fund.

| | | | | | |
|---|---|---|---|---:|---:|
| Year | 1904, | amount | ............................. | $21,625 | 00 |
| " | 1905 | " | ............................. | 18,758 | 00 |
| " | 1906 | " | ............................. | 9,695 | 00 |
| " | 1907 | " | ............................. | 13,435 | 00 |
| " | 1908 | " | ............................. | 5,770 | 00 |
| " | 1909 | " | ............................. | 735 | 00 |
| " | 1910 | " | ............................. | 4,255 | 00 |
| " | 1911 | " | ............................. | 800 | 00 |
| " | 1912 | " | ............................. | 2,248 | 00 |
| " | 1913 | " | ............................. | 2,690 | 00 |
| " | 1914 | " | ............................. | 345 | 90 |
| | | | | $80,356 | 90 |

*Schedule IV.* Amounts collected for *trespass* upon and timber sold from swamp lands partitioned under the act of

State ex rel. Owen v. Donald, 162 Wis. 609.

1865 to the *normal school fund* and paid into the general fund.

| | | | |
|---|---|---|---:|
| Year 1898, amount | | | $661 23 |
| " 1900 | " | | 503 50 |
| " 1901 | " | | 188 00 |
| " 1902 | " | | 433 73 |
| " 1903 | " | | 237 15 |
| " 1904 | " | | 1,239 68 |
| " 1905 | " | | 499 00 |
| " 1907 | " | | 53 46 |
| " 1909 | " | | 819 71 |
| " 1911 | " | | 602 78 |

$5,238 24

*Schedule V.* Amounts collected for *trespasses* upon and timber sold from swamp lands partitioned under the act of 1865 to drainage fund, paid into general fund.

| | | | |
|---|---|---|---:|
| Year 1893, amount | | | $683 62 |
| " 1899 | " | | 15 00 |
| " 1900 | " | | 944 72 |
| " 1902 | " | ($2,043 34) | 400 00 |
| " 1904 | " | | 1,254 18 |
| " 1907 | " | | 150 00 |
| " 1909 | " | | 876 15 |
| " 1910 | " | ($2,381 01) | 100 68 |

($4,424 35)    $4,424 35

*Schedule VI.* Amount collected for trespasses upon and timber sold from indemnity lands not partitioned between the normal school and drainage funds under the act of 1865 and paid into the general fund.

Year 1904, amount.......................... $1,370 16

*Schedule VII.* Amounts paid into the *forest reserve fund* from sales of indemnity lands that were never partitioned between the normal school and drainage funds.

| | | | |
|---|---|---|---:|
| Year 1907, amount | | | $49,864 00 |
| " 1908 | " | | 444 00 |
| " 1909 | " | | 644 50 |
| " 1911 | " | | 13,543 00 |
| " 1912 | " | | 1,862 00 |
| " 1913 | " | | 209 00 |
| " 1914 | " | | 1,746 16 |

$68,312 66

*Schedule VIII.*    Amounts paid into forest reserve fund from the receipts from the sale of swamp lands partitioned to the normal school fund under the act of 1865.

| | | | |
|---|---|---|---:|
| Year | 1906, | amount | $2,614 50 |
| " | 1907 | " | 21,893 80 |
| " | 1908 | " | 8,422 00 |
| " | 1909 | " | 4,563 00 |
| " | 1910 | " | 4,461 17 |
| " | 1911 | " | 40,951 00 |
| " | 1912 | " | 16,908 37 |
| " | 1913 | " | 9,615 89 |
| " | 1914 | " | 7,294 00 |
| | | | $116,723 73 |

Note.—$613 of this amount was the price paid for land, the sale of which was canceled and money returned to purchaser or held for him in treasury............................. 613 00

$116,110 73

*Schedule IX.*    Amounts paid into the forest reserve fund from receipts from the sale of swamp lands partitioned to the drainage fund under the act of 1865.

| | | | |
|---|---|---|---:|
| Year | 1906, | amount | $1,122 50 |
| " | 1907 | " | 23,833 00 |
| " | 1908 | " | 7,499 00 |
| " | 1909 | " | 4,473 00 |
| " | 1910 | " | 5,575 35 |
| " | 1911 | " | 42,998 00 |
| " | 1912 | " | 14,276 00 |
| " | 1913 | " | 10,158 49 |
| " | 1914 | " | 9,737 00 |
| " | 1915 | " | 130 00 |
| | | | $119,803 34 |

Amount refunded to purchasers on canceled sales .................................... 916 00

$118,886 34

*Schedule X.*    Amounts collected for trespass upon and timber sold from swamp lands partitioned under the act of 1865 to the *normal school fund* and paid into the forest reserve fund.

| | | | |
|---|---|---|---:|
| Year | 1906, | amount | $673 40 |
| " | 1907 | " | 5,675 11 |
| " | 1908 | " | 1,633 59 |
| " | 1909 | " | 10,417 49 |
| " | 1910 | " | 3,064 87 |
| " | 1911 | " | 8,664 24 |
| " | 1912 | " | 9,162 89 |
| " | 1913 | " | 10,335 37 |
| " | 1914 | " | 2,442 74 |
| " | 1915 | " | 99 06 |
| | | | $52,168 76 |

*Schedule XI.* Amounts collected for trespass upon and timber sold from swamp lands partitioned in 1865 to *drainage* fund and paid to *forest reserve fund.*

| | | | | |
|---|---|---|---|---:|
| Year | 1906, | amount | .................................... | $424 43 |
| " | 1907 | " | .................................... | 2,494 72 |
| " | 1908 | " | .................................... | 1,252 16 |
| " | 1909 | " | .................................... | 10,573 00 |
| " | 1910 | " | .................................... | 3,516 08 |
| " | 1911 | " | .................................... | 4,398 36 |
| " | 1912 | " | .................................... | 11,053 41 |
| " | 1913 | " | .................................... | 10,036 53 |
| " | 1914 | " | .................................... | 2,515 50 |
| " | 1915 | " | .................................... | 310 70 |

$46,574 89

*Schedule XII.* Amounts collected for trespass upon and timber sold from indemnity lands not partitioned between the normal school fund and the drainage fund in 1865 and paid to the forest reserve fund.

| | | | | |
|---|---|---|---|---:|
| Year | 1908, | amount | .................................... | $1,310 21 |
| " | 1910 | " | .................................... | 168 65 |
| " | 1911 | " | .................................... | 254 00 |
| " | 1913 | " | .................................... | 1,056 12 |
| " | 1914 | " | .................................... | 831 59 |

$3,620 57

*Schedule XIII.* Amounts falling due on contracts for swamp lands assigned to drainage fund under act of 1865 and sold on contract, collected and paid into the general fund.

| | | | | |
|---|---|---|---|---:|
| Year | 1913, | amount | .................................... | $235 00 |
| " | 1914 | " | .................................... | 200 00 |
| " | 1915 | " | .................................... | 705 00 |

$1,140 00

*Schedule XIV.* Amounts falling due on contracts for swamp lands assigned to the normal school fund under the act of 1865 and sold on contract, collected and paid into the general fund.

| | | | | |
|---|---|---|---|---:|
| Year | 1913, | amount | .................................... | $300 00 |
| " | 1914 | " | .................................... | 227 00 |
| " | 1915 | " | .................................... | 783 00 |

$1,310 00

*Schedule XV.*   Amounts of *interest* on contracts for sale of swamp lands partitioned to normal school fund under act of 1865, collected and paid into the *general fund.*

| Year | 1912, amount | | | |
|---|---|---|---|---|
| Year | 1912, amount | | | $233 35 |
| " | 1913 | " | | 340 96 |
| " | 1914 | " | | 102 66 |
| " | 1915 | " | | 267 13 |
| | | | | $934 10 |

*Schedule XVI.*   Amounts of *interest* on contracts for sale of swamp lands partitioned to drainage fund under act of 1865, collected and paid into the *general* fund.

| Year | 1912, amount | | | |
|---|---|---|---|---|
| Year | 1912, amount | | | $176 87 |
| " | 1913 | " | | 237 29 |
| " | 1914 | " | | 94 21 |
| " | 1915 | " | | 16 87 |
| | | | | $525 24 |

*Schedule XVII.*   Amounts of *interest* on contracts for sale of swamp lands partitioned to *normal school* fund under act of 1865, collected and paid into the forest reserve fund.

| Year | 1912, amount | | | |
|---|---|---|---|---|
| Year | 1912, amount | | | $633 02 |
| " | 1913 | " | | 713 72 |
| " | 1914 | " | | 1,270 25 |
| " | 1915 | " | | 938 79 |
| | | | | $3,555 78 |

*Schedule XVIII.*   Amounts of *interest* on contracts for sale of swamp lands partitioned to the *drainage fund* under the act of 1865, collected and paid into the forest reserve fund.

| Year | 1912, amount | | | |
|---|---|---|---|---|
| Year | 1912, amount | | | $672 24 |
| " | 1913 | " | | 917 16 |
| " | 1914 | " | | 1,164 37 |
| " | 1915 | " | | 847 14 |
| | | | | $3,600 91 |

*Schedule XIX.*   Amounts of principal falling due on contracts for swamp lands assigned to the *normal school fund* under the act of 1865 and sold on contract, collected and paid into the forest reserve fund.

| Year | 1912, amount | | | |
|---|---|---|---|---|
| Year | 1912, amount | | | $470 00 |
| " | 1913 | " | | 1,847 80 |
| " | 1914 | " | | 1,429 25 |
| " | 1915 | " | | 600 00 |
| | | | | $4,347 05 |

*Schedule XX.* Amounts of principal falling due on contracts for swamp lands partitioned to the *drainage* fund under the act of 1865 and sold on contract, collected and paid into forest reserve fund.

| | | | | |
|---|---|---|---|---|
| Year | 1912, | amount | $827 | 00 |
| " | 1913 | " | 960 | 00 |
| " | 1914 | " | 1,375 | 00 |
| " | 1915 | " | 979 | 20 |
| | | | $4,141 | 20 |

*Schedule XXI.* Amounts collected for rents and hay and grass sold from swamp lands partitioned to *drainage fund* under the act of 1865 and paid into the forest reserve fund.

| | | | | |
|---|---|---|---|---|
| Year | 1907, | amount | $12 | 60 |
| " | 1908 | " | 125 | 50 |
| " | 1909 | " | 34 | 00 |
| " | 1911 | " | 260 | 15 |
| " | 1912 | " | 200 | 00 |
| " | 1913 | " | 316 | 18 |
| " | 1914 | " | 465 | 00 |
| " | 1915 | " | 99 | 54 |
| | | | $1,512 | 97 |

*Schedule XXII.* Amounts collected for rent and hay and grass sold from lands partitioned to the normal school fund under act of 1865 and paid into *forest reserve fund.*

| | | | | |
|---|---|---|---|---|
| Year | 1910, | amount | $140 | 86 |
| " | 1911 | " | 306 | 72 |
| " | 1912 | " | 234 | 34 |
| " | 1913 | " | 400 | 00 |
| " | 1914 | " | 500 | 00 |
| " | 1915 | " | 6 | 50 |
| | | | $1,589 | 35 |

There was collected for hay and grass sold from swamp lands partitioned under the act of 1865 to the normal school fund and paid into the general fund during year ending 1910................. $120 68

### Newly acquired lands.

These were acquired by the forestry department by purchase and on tax deeds. Schedule I contains descriptions of those purchased; Schedule K of those acquired on tax title. The judgment is that they "have the cast of the constitutional trust fund lands and will be administered accordingly

until, upon a full accounting, it shall be found what part, if any, will remain after fully restoring the integrity of the trust fund lands and trust funds." The accounting shows a large indebtedness to each of the four constitutional trust funds. The integrity of said funds will not be fully restored until all of said indebtedness is paid. The reason for such lands having such cast is stated in the opinion as follows:

"On account of the unwarranted confusion of different classes of trust fund lands with lands purchased by proceeds of trust fund lands and other moneys, including money drawn from the general fund, and income from trust funds, and other confusions, all must be regarded as having the cast of trust fund lands and money so far as necessary to the full restoration of such trust fund lands and property, and identification of the amount belonging to each fund as of the date of ch. 367, Laws 1897, and further back if found practicable."

If the meaning of the court is that the newly acquired lands have the cast only of such trust fund lands as were confused with others, as only swamp and indemnity lands were so confused there is no lien upon them in favor of any fund other than the normal school fund; and if the meaning is that the lien in favor of the normal school fund extends only to securing the indebtedness to it occasioned by such confusion of lands, it would not cover the debt arising from money taken and used for other state purposes in form of loans secured by certificates of indebtedness, nor to the indebtedness arising from the lands given away and lost to the fund, nor to that arising from using the principal of the fund as income.

It may not be necessary for this report to cover the extent of that lien more definitely than it is covered by the judgment. I assume that the court would want it definitely, either by the report approved or modified and confirmed or by further provision in the judgment. The former course seems to be that indicated in the opinion. *State ex rel. Owen v. Donald,* 160 Wis. 21, 152, 151 N. W. 331.

I have construed the opinion and judgment of the court to be that upon the facts and conclusions pointed out in this report all the newly acquired lands have the cast of normal school lands, and are to be administered as such until the entire debt of the general fund as found in this report is fully paid.

## Conclusions.

Following the interpretation of the court's opinion and judgment, and of the constitution and statutes, as above explained, I find and report:

*1. As to the normal school fund.*

(a) All of the lands conveyed to the state of Wisconsin pursuant to the provisions of the act of Congress approved September 28, 1850, and the act of Congress approved March 2, 1855, and known as swamp and indemnity lands, respectively, to which the state still holds title, belong to the normal school fund. Said lands are described in Schedules A, B, and C, referred to as part of this report. 151,442.29 acres.

(b) The southwest quarter of the southeast quarter of section twenty-two (22), township seventeen (17), range two (2) east, and the northwest quarter of the northeast quarter of section twenty-one (21), township seventeen (17), range two (2) east, which the legislature attempted by ch. 49, Laws 1897, and ch. 293, Laws 1899, to set aside as a perpetual military reserve, belong to the normal school fund.

(c) Lot nine (9), block nineteen (19), in W. M. Dennison's addition to the city of Watertown, and lots 3, 4, 5, and 8, in block 251 in the village (now city) of Manitowoc, belong to the normal school fund.

(d) All the right, title, or interest that the state of Wisconsin has in lands in the Menominee and Stockbridge and Munsee Indian reservations, for which lands patents were given to the state under the act of Congress approved September 28, 1850,—the state's title being contested in behalf of the Indians,—belong to the normal school fund. Said

lands are described in Schedule D, referred to as part of this report. The quantity shown is 16,214.48 acres.

(e) An undivided one-half of all lands in Indian reservations to which the state is entitled to patents under said act of 1850, but which have not been patented, belongs to said normal school fund.

(f) An undivided one-half interest in all claims of the state against the United States for other lands and more money than it has received, based on the provisions of the said acts of Congress of 1850 and 1855, belongs to the normal school fund.

(g) All mineral and all mining and water-power rights excepted from or reserved in patents for swamp or indemnity lands given by the state since June 12, 1909, belong to the normal school fund.

(h) Contracts held by the state for the sale since 1910 of 8,992.90 acres of swamp and indemnity lands lying north of township thirty-three (33), on which there remains unpaid $24,125, belong to the normal school fund. They are described in Schedule F, referred to as part of this report.

(i) Contracts held by the state for the sale since 1910 of 840 acres of swamp and indemnity lands lying south of township thirty-four (34), on which there remains unpaid $2,343, belong to the normal school fund. They are described in Schedule G, referred to as part of this report.

(k) Seven hundred dollars and thirty-seven cents ($700.37), one half of $1,400.74 in the state treasury to the credit of a fund designated "indemnity land fund," belongs to the normal school fund.

(l) There are in the custody of the state land commissioners securities for loans made from the principal of said normal school fund, of which there is a correct and detailed record in the office of the secretary of state, and a balance in the state treasury to the credit of said fund, all of which belong to said normal school fund.

(m) The general fund is indebted to the normal school fund in the sum of one million five hundred and seventeen thousand five hundred and fourteen dollars and twenty-three cents ($1,517,514.23), which arose as follows:

| | |
|---|---:|
| (1) The value of normal school lands given away without consideration.............................. | $96,063 14 |
| (2) Moneys belonging to the principal of this fund placed in the income fund and spent........... | 70,939 02 |
| (3) Moneys taken from the principal of the trust fund and used as part of the general fund for general state purposes................................ | 515,700 00 |
| (4) Proceeds from sales of normal school lands paid into and used as part of the general fund........ | 419,674 69 |
| (5) Proceeds from sale of normal school lands paid into the forest reserve fund and used for forestry purposes .................................... | 414,162 20 |
| | $1,515,539 05 |
| (6) One half amount received from Fuller and others for interest in swamp lands not patented to state | 1,975 18 |
| | $1,517,514 23 |

(n) The normal school fund has a lien upon all the lands acquired by the state under the "forestry law," either by purchase or by tax deeds, for the full amount of said indebtedness of the general fund to said normal school fund. All of said lands have the cast of normal school fund lands and are to be administered as such until upon a full accounting it shall appear that said indebtedness has been fully paid from the proceeds of said lands or other sources. Said lands are described in Schedules I and K. The quantity shown is 157,091.44 acres.

*2. As to drainage fund.*

(a) There are no unsold swamp or indemnity lands which have been conveyed to the state that belong to the drainage fund.

(b) There are pending claims against the United States for other lands than have been conveyed to the state under the provisions of the acts of Congress approved September 28, 1850, and March 2, 1855, and for moneys received by the United States on the sale by it of lands claimed by

660    SUPREME COURT OF WISCONSIN.    [APR.

State ex rel. Owen v. Donald, 162 Wis. 609.

the state under said acts.    One half of all lands and moneys,. if any, received by the state on said claims, or others of the same character, belong to said drainage fund, subject to the decision by the legislature that said half or some part of it is not necessary for reclamation of said lands.    Any such decision would automatically transfer the lands or funds affected by it to the normal school fund.

(c) Seven hundred dollars and thirty-seven cents ($700.37), one-half of $1,400.74 in the state treasury to the credit of a fund designated "indemnity land fund," belongs to the drainage fund.

(d) There is a small balance in the state treasury to the credit of the drainage fund which belongs to said fund.

(e) There is no indebtedness from the general fund to said drainage fund.

*3. As to the school fund.*

(a) There are in the custody of the state land commissioners securities for loans made from the principal of said fund, of which there is a correct and detailed record in the office of the secretary of state, and a balance in the state treasury to the credit of said fund, all of which belong to said school fund.

(b) The general fund is indebted to said school fund in the sum of one million five hundred and sixty-four thousand five hundred and forty dollars ($1,564,540), which arose as follows:

| | |
|---|---:|
| (1) Money taken from the principal of the said school fund and used as part of the general fund for general state purposes | $1,563,700 00 |
| (2) Money derived from the sale of school lands and paid into the general fund | 840 00 |
| | $1,564,540 00 |

*4. As to the university fund.*

(a) There are in the custody of the state land commissioners securities for loans made from the principal of said fund, of which there is a correct and detailed record in the office of the secretary of state, and a balance in the state

treasury to the credit of said fund, all of which belong to. said university fund.

(b) The general fund is indebted to said university fund in the sum of one hundred and eleven thousand dollars. ($111,000), all of which arose from moneys taken from the principal of said fund and used as part of the general fund for general state purposes.

*5. As to the agricultural college fund.*

(a) There are in the custody of the state land commissioners securities for loans made from the principal of said fund, of which there is a correct and detailed record in the office of the secretary of state, and a balance in the state treasury to the credit of said fund, all of which belong to said agricultural college fund.

(b) The general fund is indebted to said agricultural college fund in the sum of sixty thousand six hundred dollars ($60,600), all of which arose from moneys taken from the principal of said fund and used as part of the general fund for general state purposes.

*6. As to the normal school income fund.*

The state has paid annually to said fund an amount equal to seven per cent. on said $515,700 since said amount was. taken from said normal school fund, and has appropriated and paid to said income fund amounts far greater in the aggregate than all the other amounts for which the general fund is indebted to the normal school fund would have earned. had they been in said fund and loaned. There is no indebtedness from the general fund to said income fund.

*7. As to the school income fund.*

The state has always paid to said fund interest at the rate of seven per cent. per annum on said $1,563,700 of indebtedness to the school fund, and has made large annual appropriations and payments to said income fund. There is no. indebtedness from the general fund to said income fund.

*8. As to the university and agricultural college income funds.*

The state has always paid to said funds interest at the rate of seven per cent. per annum on the amount of the general fund's indebtedness to the university and agricultural college funds respectively, hereinbefore stated, and the general fund is not indebted to either of said income funds.

*9. As to all said trust and income funds.*

The contracts referred to above as belonging to the normal school fund (h) were treated by the state land commissioners as belonging to the forest reserve fund; and those above referred to (i) were treated by said commissioners as belonging to the general fund, and none of them were ever credited to the normal school fund.

There are in said normal school fund, belonging and properly credited to it, contracts for the sale of lands partitioned to it, made prior to 1903, on which part of the purchase money has not been paid. There are also in said university, agricultural college, and school funds contracts for the sale of lands belonging to them respectively, on which part of the purchase money has not been paid. These contracts belong respectively to the funds to which the lands belonged, and are all so carried on the books of the state land office and secretary of state.

In the foregoing statement that certain contracts and securities belong respectively to the respective funds named, the intent and meaning is that the principal belongs to said funds and the interest accrued and to accrue belongs to the respective income funds.

10. The schedules showing payments into the general and forest reserve funds show payments only to July 1, 1915. Payments of small items have been made since on the contracts referred to in Schedules F and G and have been credited to the general fund and forest reserve fund in the same

manner as before this action arose.   I have not deemed it necessary to follow these payments down to date, as more might be made the next day and during the time intervening between the filing of this report and final judgment.   But I find and report that all amounts paid on said contracts since July 1, 1915, or that may hereafter be paid, belong to the normal school fund, and the judgment of the court should order them transferred to and credited to said normal school fund.

            (Signed)   SAMUEL D. HASTINGS,
October 7, 1915.                         Special Referee.

Thereafter, on April 15, 1916, the Commissioners of Public Lands filed the following report:

### REPORT OF COMMISSIONERS OF PUBLIC LANDS.

The mandate of the court herein having referred the above entitled cause to the Commissioners of Public Lands and Judge Samuel D. Hastings, as special referee, for the purpose of making the accounting required by the eleventh paragraph of said mandate;

And the said Judge Samuel D. Hastings, special referee, having heretofore and on the 7th day of October, A. D. 1915, made and filed in this court his report of such accounting as such referee;

And we, the Commissioners of Public Lands, having considered the said report of said Judge Samuel D. Hastings, are of the opinion and so report, that Schedule II of said report should be corrected by deducting therefrom the sum of three thousand eight hundred and seventy-five dollars and twenty-five cents, which amount, received for the sale of certain city lots in the city of Fond du Lac, is included in the computation of said Schedule II, and which were never any part of the trust fund lands.

With the above exception, we approve of and concur in the report as filed by said Judge Samuel D. Hastings, special referee, herein.

Dated this 15th day of April, A. D. 1916.

J. S. Donald, Secretary of State,

Henry Johnson, State Treasurer,

Walter C. Owen, Attorney General,

*Commissioners of Public Lands.*

The following order was made by the court and filed April 15, 1916:

The referees' report in the above entitled cause having been duly considered and conclusions reached in respect thereto:    •

Ordered as follows:

1st. The amount in Schedule II is changed by deducting $3,875.25, proceeds of Fond du Lac, Wisconsin, lots, they not having been trust fund property.

2d. In harmony with such change, the amount under subdivision (m) of the conclusions, as proceeds of sale of land of normal school character, paid into the general fund, is changed to $415,799.44, making the total which should be accounted for by the state to the normal school fund, exclusive of that represented by certificates of indebtedness, $996,591.77, and with the amount so represented, $1,512,291.77.

3d. The report is further modified so far as it would, when confirmed, otherwise require dues to the trust fund to be charged against and deplete the general fund in advance of provision being made therefor by the legislature.

4th. The conclusions in the report, subject to the changes aforesaid, are confirmed; provided, however, that, regardless of the strict legal character of the certificates of indebtedness, the trust fund, as to income, should be protected as heretofore, according to the letter of such certificates, and

the other indebtedness to the trust fund referred to in sub-division 2 of this order should be suitably protected as to in-come until the principal shall have been restored by legis-lative action.

5th. ORDERED further that, whereas the report of the ref-erees brings the matters referred to therein down to July 1, 1915, as indicated in the last paragraph of such report, the state officers having charge of the property and funds of nor-mal school character should continue such account as to oc-currences with such property since such date or hereafter, on the same basis as that indicated in such report, correcting any errors which may have been made since such date by payment of money into the general fund or forestry fund which rightfully should have been paid into the normal school fund or normal school fund income.

6th. ORDERED further that this confirmation shall be sub-ject to correction on application made therefor as may be found hereafter necessary in order to correct mistakes.

7th. ORDERED further that a copy of the referees' report, together with this order and the schedules referred to in such report, be recorded in the office of the Commissioners of Public Lands, in such form as to be convenient for reference in respect to any matter therein referred to.

Dated the 15th day of April, 1916.

By the Court,

ARTHUR A. McLEOD,

Clerk.